**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | |
|---|---|
| J.W., a minor, by and through his<br>Next Friend, RYAN WESTHOLT,<br><br>     Plaintiff,<br><br>     v.<br><br>COTTER CORPORATION N.S.L.<br>(Serve at: 7800 E. Dorado Pl. Ste. 210<br>Greenwood Village, CO 80111)<br><br>and<br><br>COMMONWEALTH EDISON COMPANY<br>(Serve: Corporate Creations Network Inc.<br>1320 Tower Rd.<br>Schaumburg, IL 60173)<br><br>and<br><br>DJR HOLDINGS, INC.<br>(Serve: Rodney Jarboe<br>9200 Latty Ave.<br>Hazelwood, MO 63042)<br><br>and<br><br>ST. LOUIS AIRPORT AUTHORITY,<br>A DEPARTMENT OF THE CITY<br>OF ST. LOUIS<br>(Serve: Mayor Cara Spencer<br>1200 Market St., Room 200<br>St. Louis, MO 63103)<br><br>and<br><br>MALLINCKRODT LLC<br>(Serve: C T Corporation System<br>5661 Telegraph Rd. Ste. 4B<br>St. Louis, MO 63129)<br><br>     Defendants. | Case No.   4:26-cv-1286<br><br>**JURY TRIAL DEMANDED** |

1

**COMPLAINT**

COMES NOW Plaintiff J.W., a minor, by and through his Next Friend, Ryan Westholt, by and through undersigned counsel, and for his Complaint against Defendants Cotter Corporation N.S.L., Commonwealth Edison Company, DJR Holdings, Inc., St. Louis Airport Authority, a department of the City of St. Louis, and Mallinckrodt, LLC, alleges and states to the Court as follows:

## I.    INTRODUCTION

1.      Plaintiff brings this action against Defendants for the wrongful death of his mother, Natalie Pizzimenti ("Ms. Pizzimenti"), whose exposure to hazardous, toxic, and radioactive materials caused or contributed to cause her Metastatic Epithelioid Hemangioendothelioma, resulting injuries, and death. Plaintiff seeks redress for bodily injury and death suffered by Ms. Pizzimenti as a result of Defendants' acts and omissions, including their negligent acts and omissions, related to the processing, transport, storage, handling, and disposal of hazardous, toxic, and radioactive materials in close proximity to residential neighborhoods in and around St. Louis County, Missouri.

## II.    JURISDICTION AND VENUE

2.      This Court has subject matter jurisdiction over this action pursuant to 42 U.S.C. § 2210(n)(2), which provides the United States District Court in the district where a nuclear incident takes place shall have original jurisdiction with respect to any public liability action arising out of or resulting from a nuclear incident.

3.      Venue is proper in this judicial district pursuant to 42 U.S.C. § 2210(n)(2) because the nuclear incident or incidents giving rise to Plaintiff's claims took place in this district.

2

### III.   PARTIES

**Plaintiff**

4.      Plaintiff J.W. is a minor and the surviving child of Ms. Pizzimenti. J.W. is a person authorized to bring this action under Mo. Rev. Stat. § 537.080. Because J.W. is a minor and does not have a duly appointed representative for purposes of this action, he brings this action by and through his father and Next Friend, Ryan Westholt, pursuant to Federal Rule of Civil Procedure 17(c).

5.      Ms. Pizzimenti lived, went to school, and frequented other areas in very close proximity to Coldwater Creek from 1988 to 2021. From birth until approximately six months of age, Ms. Pizzimenti lived at 980 Manresa Lane in Florissant, Missouri, less than one mile from Coldwater Creek. From approximately six months of age until age thirty-three, Ms. Pizzimenti lived at 435 Versailles Drive in Florissant, Missouri, less than one-half mile from Coldwater Creek. From kindergarten through sixth grade, Ms. Pizzimenti attended Jana Elementary School, which is located within the Coldwater Creek floodplain.

6.      In January of 2017, Ms. Pizzimenti was diagnosed with Metastatic Epithelioid Hemangioendothelioma (EHE). As a result of Defendants' acts and omissions described in this Complaint, Ms. Pizzimenti developed and suffered significant, debilitating personal injuries. As a result of Defendants' acts and omissions described in this Complaint, Defendants released radiation into unrestricted areas in the environment in excess of the levels permitted by federal regulations in effect at the time of their operations. As a result of Defendants' acts and omissions described in this Complaint, Ms. Pizzimenti was exposed to some of this radiation, and her exposure levels exceeded background.

7.      Ms. Pizzimenti died in August of 2023. Plaintiff J.W. has sustained damages

3

recoverable under Missouri law as a result of the wrongful death of his mother.

**Defendants**

8.      Cotter Corporation N.S.L. ("Cotter") is a Colorado corporation with its principal place of business in Englewood, Colorado, which operates as a subsidiary of General Atomics, Inc., a California corporation. Cotter was purchased by and became a wholly owned subsidiary of Commonwealth Edison in 1974, immediately prior to announcing that there was no radioactive contamination on the property upon which it operated. It was then sold to General Atomics in 2000.

      A.  Cotter continuously and systematically carried on business activities in the State of Missouri in its own name, and through its parent company ComEd.

      B.  This lawsuit arises out of damages that resulted from Cotter's conduct including acts and omissions within the State of Missouri, as well as the acts and omissions of the predecessors of Cotter, which give rise to the injuries and death alleged in this Complaint.

9.      Commonwealth Edison Company ("ComEd") is an Illinois corporation, whose former subsidiary corporation, Cotter, conducted business operations in Missouri. Upon the sale of Cotter, ComEd agreed to indemnify Cotter for certain liabilities associated with these activities. The responsibility to indemnify Cotter was transferred to Exelon Generation Company, LLC when ComEd's parent company, Exelon Corporation, restructured in 2001. Exelon Generation Company, LLC was split from Exelon and is now known as Constellation Energy Generation, LLC.

      A.  ComEd continuously and systematically carried on local business activities in the State of Missouri, both on its own and through its subsidiary Cotter.

In addition, ComEd owned Cotter at times relevant to this Complaint, and agreed to indemnify Cotter for liabilities associated with the creation, storage, transportation, and processing of hazardous, toxic, carcinogenic, radioactive wastes as alleged herein.

B.  When ComEd purchased Cotter, it assumed Cotter's liabilities by its own corporate policies and by law and was obligated to require its subsidiary to comply with the rules and regulations in Missouri and the relevant laws cited in this Complaint. ComEd furthermore assumed the environmental safety and health functions of its subsidiary, Cotter. Cotter and ComEd knew or should have known substantial waste was in Coldwater Creek as a result of Cotter's operations and on the properties upon which Cotter controlled and had operated and which it knowingly and intentionally abandoned. On information and belief, ComEd, through its pre-purchase due diligence, knew about the remaining contamination, yet did nothing to mitigate the threat to public health, such that ComEd is liable as a corporate successor to Cotter.

C.  After the sale of Cotter to ComEd, they jointly conspired to perpetuate the fraud that there was no radioactive contamination remaining with respect to Cotter's abandoned operations. On information and belief, ComEd controlled the policy and business of Cotter such that Cotter was a mere instrument or alter ego of ComEd.

D.  ComEd used its control over Cotter to perpetuate the negligent and unlawful contamination in contravention of Ms. Pizzimenti's rights, and ComEd's

5

control over Cotter is a proximate cause of the contamination that caused or contributed to cause Ms. Pizzimenti's injuries and death.

E.   This lawsuit arises out of damages that resulted from ComEd's conduct, including acts and omissions within the State of Missouri, as well as the acts and omissions of the predecessors of ComEd, which gave rise to the violations of law and damages alleged in the Complaint.

10.   DJR Holdings, Inc., formerly known as Futura Coatings, Inc. ("Futura Coatings") is a Missouri corporation with its principal place of business in Missouri, and whose alter ego is Jarboe Realty & Investments Co., Inc.

11.   The St. Louis Airport Authority, which is a department of the City of St. Louis, is now and was at all times herein mentioned a public entity organized and existing pursuant to Article 6, Section 31 of the Missouri Constitution.

12.   Mallinckrodt LLC, a Delaware limited liability company, maintains its headquarters in Missouri at 675 McDonnell Blvd., Hazelwood, MO 63042, and is an indirect affiliate of Mallinckrodt plc, a publicly owned company. Upon information and belief, in 1986, Mallinckrodt Missouri was dismantled and sold to MI Holdings, Inc. and Mallinckrodt, Inc. Upon information and belief, Mallinckrodt Chemical Works is now known as or has been merged into MI Holdings and/or Mallinckrodt, Inc. Upon information and belief, Mallinckrodt LLC is the successor-in-interest to Mallinckrodt, Inc. and Mallinckrodt Chemical Works. Mallinckrodt Nuclear Corporation was formerly a wholly owned subsidiary of Mallinckrodt Chemical Works. All foregoing Mallinckrodt entities will be referred to collectively as "Mallinckrodt."

## IV.   FACTS

13.   From 1942 to 1957, under contracts with the United States government, the

6

Destrehan Street Refinery and Metal Plant (which later became Mallinckrodt Chemical Works) processed natural uranium into uranium oxide, trioxide, and metal uranium at a facility in downtown St. Louis, Missouri. This facility became known as the St. Louis Downtown Site ("SLDS").

14.     As detailed herein, the Defendants are individually responsible for radioactive waste materials (hereinafter "RWM") that were generated by Mallinckrodt at the SLDS.

15.     Each of these Defendants were lawfully accountable for the property on which the RWM was stored and/or they were responsible for managing the RWM. All of the Defendants failed in this regard, causing the release of hazardous, toxic, and radioactive substances which have now been physically deposited on surrounding properties by various means including wind, soil, surface water, and groundwater transmission.

16.     This deposition of RWM on surrounding properties is above the background, it's unique, and readily identifiable from naturally occurring Missouri radiation.

17.     The properties where Ms. Pizzimenti lived, went to school, and frequented contained radiation above background to which Ms. Pizzimenti was exposed.

18.     Ms. Pizzimenti's exposure to this radiation above background caused or contributed to cause her to develop EHE.

19.     The RWM would not be on the properties where Ms. Pizzimenti lived, went to school, and frequented, and would not have caused or contributed to cause Ms. Pizzimenti's EHE, resulting injuries, and death, but for the acts and omissions of the Defendants.

**Radioactive Wastes**

20.     The RWM for which Defendants were responsible contain radioactive isotopes including, but not limited to, uranium, thorium, and radium.

7

21.     Ounce for ounce, radioactive isotopes are the most toxic materials known to man.

22.     Radiation is a type of energy transmitted over a distance. Some materials spontaneously emit radiation through a process known as radioactive decay. As these materials decay they release radiation energy and transform into other radioactive materials which will then also decay by releasing radiation energy and transforming into other materials.

23.     Some radiation energies, including the radiation from the decay of radioactive materials used in nuclear and atomic processes, such as uranium, have the ability to penetrate other material. When radiation energy interacts with other material, it causes a process called ionization[1] which can damage chemical structures. When the "other material" that ionizing radiation passes through is human cells, it can cause damage within those cells resulting in mutation in genetic material which can lead to cancer and other detrimental conditions.

24.     People are exposed to radiation in two ways: external exposure from radioactive material in the environment and internal exposure by radioactive material that has entered the body. Radioactive material can be taken into the body by consuming foodstuffs and liquids with radioactivity in them, by inhaling radioactive gases or aerosol particles, or by absorption through wounds in the skin. The material taken in will internally threaten the organs and tissues for as long as it remains inside the body.

25.     One characteristic of the impact of exposure to ionizing radiation on the human body through both internal and external exposure is that even if the energy absorbed is low, the biological effects can still be gravely serious. The second characteristic is that there are latent

---

[1] Ionizing Radiation is a form of radiation that includes alpha particles, beta particles, gamma rays, x-rays, neutrons, high-speed electrons, high-speed protons, and other particles capable of producing ions. Ionizing radiation has enough energy to cause changes in atoms through a process called ionization. Ionization can affect the atoms in living things and depending on the dose and exposure, can pose a serious health risk to humans. Ionizing radiation has sufficient energy to cause chemical changes in cells, causing damage to tissue and DNA in genes.

biological effects of radiation.

26.     The injuries resulting from exposure to ionizing radiation can also be separated into two categories: somatic injuries and genetic injuries. Somatic injuries are damages to the individual exposed. This can include damages to the skin, reproductive system, blood forming system, digestive system, central nervous system, and immune system, as well as cancers. Illnesses such as cancers may take a number of years to appear.

27.     Genetic injury is damage to the reproductive cells of the exposed individual in the form of mutation of their genetic cells. As a result, the probability of detrimental effects to the descendants of the exposed persons may greatly increase. These genetic mutations can be passed down to a person's offspring even generations later. These injuries include birth abnormalities and cancer.

28.     One of the most dangerous aspects of radioactive materials is the length of time that radioactive isotopes will persist and accumulate in the environment. As detailed above, radioactive materials decay over time and each radioactive material gives off radiation energy as it decays and transforms into a different material. The rate at which a radioactive isotope decays is measured in half-life. The term "half-life" is defined as the time it takes for one-half of the atoms of a radioactive material to disintegrate. For example, after one half life, there will be one half of the original material, after two half-lives, there will be one fourth the original material, after three half-lives one eight the original sample, and so forth.

29.     Radioactive isotopes are known human carcinogens and are among the most toxic materials known to man. When property becomes contaminated with these wastes, the dangers can persist in the environment for thousands of years. Radioactive wastes should be handled, stored, and disposed of with the utmost safety in mind. Exposures to radioactive wastes should be as low

9

as is reasonably achievable.

**Mallinckrodt produced radioactive waste materials which were transported to and stored at St. Louis Airport Site**

30.     Between 1942 through 1957, under contracts with the United States government, Mallinckrodt processed uranium at a facility located in downtown St. Louis, Missouri. This site is known as the St. Louis Downtown Site ("SLDS").

31.     As part of its operations at SLDS, Mallinckrodt processed uranium ore from the Belgian Congo containing high percentages of uranium. The elemental composition of the resulting waste material is unique and with proper testing can be easily identified and distinguished from naturally occurring radiation in Missouri.

32.     Between 1947 and 1957, Mallinckrodt transported RWM from SLDS to a site in North St. Louis County near the Lambert Airport. This site is located next to Coldwater Creek and is known as the St. Louis Airport Site ("SLAPS").

33.     The SLAPS site was managed and operated by Mallinckrodt starting in 1953. Mallinckrodt exercised custody and control over the SLAPS site pursuant to its contract with the United States government.

34.     Over 100,000 tons of RWM accumulated at SLAPS. Mallinckrodt stored these RWM in bulk on the open ground in piles.

35.     Scrap metal, chemical drums, and other contaminated debris were placed in low areas at SLAPS adjacent to Coldwater Creek on the western end of the property and covered with dirt to make a level storage area.

36.     By 1960, there were approximately 50,000 empty drums and approximately 3,500 tons of miscellaneous contaminated steel and alloy scrap stored onsite at SLAPS along with the RWM.

10

37.     As a result of Mallinckrodt's acts and omissions at the SLAPS site, Coldwater Creek and surrounding properties continued to be contaminated with radioactive materials in excess of background levels.

**The St. Louis Airport Authority purchased SLAPS and failed to prevent continued dispersal of radioactive materials**

38.     In 1973, the SLAPS site was sold to the St. Louis Airport Authority, a department of the City of St. Louis, by quitclaim deed.

39.     Thereafter, despite knowing that significant activities involving radioactive material were conducted on the site, the St. Louis Airport Authority, a department of the City of St. Louis, did nothing to prevent continued dispersal and runoff of hazardous, toxic, carcinogenic, radioactive wastes into Coldwater Creek.

40.     The St. Louis Airport Authority is the current owner of the SLAPS site.

41.     As a result of the St. Louis Airport's acts and omissions at the SLAPS site, Coldwater Creek and surrounding properties continued to be contaminated with radioactive materials in excess of background levels.

**Radioactive waste materials are moved from SLAPS to Latty Avenue**

42.     In the late 1960's, private companies purchased and assumed responsibility for the RWM stored at SLAPS. According to the offer for sale, the RWM constituted source material requiring a license pursuant to the Atomic Energy Act.

43.     The RWM were transported from SLAPS to another site on Coldwater Creek located at 9200 Latty Avenue in Hazelwood, Missouri (part of this site later became known as the Hazelwood Interim Storage Site ("HISS")). The Latty Avenue site is approximately 1 mile downstream from the SLAPS site.

44.     The radioactive waste materials transferred from SLAPS to Latty Avenue include,

11

but are not limited to: (1) pitchblende raffinate, (2) Colorado raffinate, (3) barium sulfate (unleached), (4) barium cake (leached), and (5) miscellaneous residues stored in deteriorated drums.

### Cotter purchased radioactive waste materials and conducted drying operations at Latty Avenue site

45.     In 1969, Cotter purchased and assumed responsibility for the RWM stockpiled at Latty Avenue. Cotter also agreed to restore the Latty Avenue site where the RWM were stockpiled.

46.     The Atomic Energy Commission issued Cotter a source material license covering 9200 Latty Avenue pursuant to which Cotter exercised custody and control over the Latty Avenue site and the RWM.

47.     Cotter never maintained financial protection pursuant to the Price Anderson Act nor did it have an indemnification agreement pursuant to the Price Anderson Act.

48.     After purchasing the RWM, Cotter dried and loaded the RWM onto railcars next to Coldwater Creek at a rate of approximately 400 tons per day. B&K Construction Company was engaged by Cotter for this purpose. At all times, B&K Construction acted as an agent of Cotter and conducted all work under Cotter's source material license. Cotter had the responsibility to ensure B&K was not violating the terms of its license.

49.     During Cotter's drying operations at Latty Avenue:

   A.   The AEC expressed concerns about a dust problem.

   B.   The AEC cited Cotter because sample surveys were "totally inadequate to determine concentrations of radioactive materials to which person are exposed pursuant to 10 CFR 20."

   C.   The St. Louis County Health Department noted violations related to the

restriction of emission of visible air contaminants.

D.  Health and environmental experts expressed concerns and noted violations of AEC regulations.

E.  Upon information and belief, RWM was washed down under the fence, which was a violation of AEC regulations.

F.  Upon information and belief, the settling ponds were in a state of disrepair.

G.  Upon information and belief, the drying equipment was in a state of disrepair.

50.  At some point during Cotter's operations at Latty Avenue, its dryer broke down. Thereafter, the site was not secured and appeared to be abandoned.

51.  In 1973, approximately 18,700 tons of radioactive waste materials remained at the Latty Avenue site. Cotter loaded approximately 10,000 tons of these materials on railcars and shipped them to Colorado. Cotter mixed the remaining radioactive waste materials with contaminated soil and dumped them in the West Lake Landfill.

52.  Cotter never conducted any activities related to Mallinckrodt's contract, or any other contract, with the government.

53.  As a result of Cotter's acts and omissions at the Latty site, Cotter released radiation into unrestricted areas in the environment in excess of the levels permitted by federal regulations in effect at the time, including but not limited to, 10 C.F.R. §§ 20.105 and 20.106.  As a result of Cotter's acts and omissions at the Latty site and Cotter's releases, Coldwater Creek and surrounding properties, including the properties where Ms. Pizzimenti lived, went to school, and frequented, were contaminated with radioactive materials in excess of background levels.

54.  Upon information and belief, Cotter's RWM remain on the Latty Avenue site to this day.

13

**Commonwealth Edison Purchases Cotter and Cotter's License is Terminated Based on Inaccurate Representations**

55.     In the early 1970s, upon information and belief, Commonwealth Edison Company ("ComEd") began conducting due diligence prior to its purchase of Cotter.

56.     On May 8, 1974, in the interest of securing a uranium supply, Commonwealth Edison Company ("ComEd") purchased Cotter Corporation for $18,000,000.00.

57.     George Rifakes became president of Cotter in May 1974. Upon information and belief, Mr. Rifakes was a ComEd employee starting in the 1950's, became a manager at ComEd in the late 1960's and became vice president of ComEd in 1980.

58.     Two days after ComEd purchased Cotter, on May 10, 1974, Cotter filed an application with the AEC to terminate its source material license certifying that the Latty Avenue site was decontaminated.

59.     Upon information and belief, in the early 1970s, health and environmental experts informed Cotter of a harmful radiation survey at the Latty site in excess of decontamination guidelines. Upon information and belief, the survey was not transmitted to the AEC and no further remediation was conducted.

60.     Two days later, on November 13, 1974, the AEC terminated Cotter's source material license.

61.     Despite Cotter's previous certification that the Latty site was decontaminated, surveys conducted in 1976 at the Latty site showed radiation levels exceeding criteria for decontamination of land areas prior to return to unrestricted use.

62.     In 1977, surveys at the Latty site showed that the site still contained licensable quantities of source material. Thereafter, the NRC informed Cotter and ComEd that its survey "raised a serious question as to whether statements Cotter Corporation made in its application for

termination of its license, with regard to contamination levels and removal of all licensable materials, were correct and, hence, whether the Commission's action terminating your license was founded on accurate representations by you."

63.     As a result of Cotter and ComEd's acts and omissions at the Latty site, the Latty site remained contaminated, and Coldwater Creek and surrounding properties, including the areas where Ms. Pizzimenti lived, went to school, and frequented, were contaminated with radioactive materials in excess of background levels.

### Jarboe Purchased Latty Site and Conducted Decontamination Operations

64.     In 1978, Jarboe Realty and Investment Company purchased the property located at 9200 Latty Avenue.

65.     Upon information and belief, DJR Holdings, Inc., f/k/a Futura Coatings and/or its alter egos leased the Latty Avenue property, which is currently owned by Jarboe Realty & Investments Co., Inc. Both DJR Holdings, Inc. and Jarboe Realty & Investments Co., Inc. are owned, operated, and controlled by the same individuals such that they are mere instruments of those individuals, and that DJR Holdings, Inc. and Jarboe Realty & Investments are indistinct from each other and from their owners.

66.     In 1979, the owner of Jarboe Realty and Investment Company, Dean Jarboe, conducted decontamination operations at 9200 Latty Avenue. During this time, 11,000 cubic yards of contaminated soil was excavated from the western half of the property by Coldwater Creek and stockpiled on the eastern half.

67.     In 1980, Jarboe Realty and Investment Company purchased the property located at 9170 Latty Avenue to store the radioactive waste.

68.     Jarboe Realty and Investment Company is the current owner of 9200 and 9170

Latty Avenue.

69.     As a result of Jarboe's acts and omissions, Coldwater Creek and surrounding properties, including the areas where Ms. Pizzimenti lived, went to school, and frequented, were contaminated with radioactive materials in excess of background levels.

**Defendants' acts and omissions contaminated
Coldwater Creek with radioactive materials**

70.     Coldwater Creek flows adjacent to the SLAPS site, then meanders next to the Latty site, and continues to flow through northern St. Louis County until it discharges into the Missouri River.

71.     As a result of Defendants' acts and omissions at the SLAPS and Latty sites, Coldwater Creek is contaminated with hazardous, toxic and radioactive materials.  The RWM was stored on the SLAPS and Latty sites with various methods, typically on the open ground, sometimes buried, and sometimes in barrels but no matter the method, it was reckless, negligent, and dangerous to store the materials in this manner.

72.     Since the late 1940's, RWM have migrated from the SLAPS site and the Latty site into Coldwater Creek and were released or otherwise deposited along the entire FEMA one-hundred-year flood plain of Coldwater Creek.

73.     Coldwater Creek was and remains contaminated with RWM; this occurred during the entire time each Defendant was responsible for the RWM and in each location the Defendants had responsibility.

74.     Coldwater Creek has flooded multiple times since 1947.

75.     As a result of this flooding, the entire one-hundred-year floodplain of Coldwater Creek is believed to be contaminated with radioactive particles, including radium, thorium and uranium.

**Defendants' acts and omissions contaminated the properties where Ms. Pizzimenti lived, went to school, and frequented, causing or contributing to cause her EHE**

76. Defendants' acts and omissions at the SLAPS and Latty sites have caused the deposition of RWM on the properties where Ms. Pizzimenti lived, went to school, and frequented. Flooding of Coldwater Creek is a significant contributor to the deposition of RWM on these properties.

77. Samples taken around Coldwater Creek confirm an elevated presence of RWM, significantly above the background radiation for this area of the United States.

78. The RWM deposited on the properties where Ms. Pizzimenti lived, went to school, and frequented is unique and identifiable from naturally occurring Missouri radiation. Upon information and belief, the RWM that has contaminated the properties where Ms. Pizzimenti lived, went to school, and frequented, match the waste fingerprint (or profile) of the RWM generated by Mallinckrodt at SLDS which were later stored at SLAPS and Latty.

79. The RWM was stored on the SLAPS and Latty sites with various methods, typically on the open ground, sometimes buried, and sometimes in barrels but no matter the method, it was reckless, negligent, and dangerous to store the materials in this manner.

80. Defendants knew or should have known of the hazards associated with their operations, including but not limited to, that their activities, consisting of storing, processing, management, and use would and did lead to migration and contamination on surrounding properties that would and did result in personal injuries to those exposed.

81. As a result of Defendants' acts and omissions, Ms. Pizzimenti was exposed to radiation in excess of background, and that exposure caused or contributed to cause her bodily injury, sickness, disease, and death.

82. Ms. Pizzimenti was diagnosed with Metastatic Epithelioid Hemangioendothelioma

17

(EHE), which her exposure to the radiation released by Defendants caused or contributed to cause. Ms. Pizzimenti died in August of 2023, and her EHE and resulting injuries caused or contributed to cause her death.

83.     Ms. Pizzimenti would not have been exposed to radiation but for the acts and omissions of the Defendants.

84.     Defendants' acts and omissions were the direct and proximate cause of Ms. Pizzimenti's EHE, resulting injuries, and death. Defendants are liable to Plaintiff for such damages.

**Regulatory history**

85.     Congress first established the Atomic Energy Commission ("AEC") in the Atomic Energy Act of 1946.

86.     In 1954 Congress replaced the Atomic Energy Act of 1946 with the Atomic Energy Act of 1954 which directed the AEC to prepare regulations that would protect public health and safety from radiation hazards.

87.     The AEC's radiation protection regulations, 10 C.F.R. Part 20, became effective starting in 1957. There were no federal safety standards related to radioactive material before this time.

88.     10 C.F.R. Part 20 was, and still is, only applicable to persons licensed by the AEC (now the NRC).

89.     Mallinckrodt's operations which started in 1942 predate the implementation of 10 CFR Part 20.

90.     Commonwealth Edison Company has never been a licensee of the AEC/NRC with respect to the acts and omissions asserted in this Complaint.

18

91.     The St. Louis Airport Authority has never been a licensee of the AEC/NRC.

92.     Jarboe Realty and Investment Company has never been a licensee of the AEC/NRC.

### COUNT I – PUBLIC LIABILITY ACTION PURSUANT TO
### THE PRICE ANDERSON ACT

93.     Plaintiff incorporates by reference all allegations of the preceding paragraphs as though fully set forth herein.

94.     In 1957, Congress enacted the Price Anderson Act, 42 U.S.C. § 2210, which established indemnification and limited liability for certain AEC licensees and contractors.

95.     In 1988, Congress enacted the Price-Anderson Amendments Act of 1988, which created a federal cause of action for "public liability actions" arising from "nuclear incidents."

96.     A "public liability action" is "any suit asserting public liability" 42 U.S.C. § 2014(hh). As relevant here, "public liability" means "any legal liability arising out of or resulting from a 'nuclear incident.'" 42 U.S.C. § 2014(hh).[2]

97.     A "nuclear incident," in turn, is "any occurrence, including an extraordinary nuclear occurrence, within the United States causing, within or outside the United States, bodily injury, sickness, disease, death, or loss of or damage to property, or loss of use of property, arising out of or resulting from the radioactive, toxic, explosive, or other hazardous properties of source, special nuclear, or byproduct material." 42 U.S.C. § 2014(q).

98.     The Eighth Circuit Court of Appeals has determined that claims arising from the radioactive materials and occurrences alleged herein constitute claims arising from a "nuclear incident" within the meaning of the PAA regardless of whether a particular defendant possessed an applicable license or indemnity agreement.

---

[2] There can be no "public liability action" without a "nuclear incident." If there has been no "nuclear incident", Plaintiff alternatively pleads Subparts (A) – (C) below as independent state law causes of action and Plaintiff's claims should be remanded to state court because there would be no federal court jurisdiction without a "nuclear incident."

99.     Consistent with the Eighth Circuit's decision, Plaintiff alleges an express cause of action, known as a "public liability action", pursuant to the PAA, because his claim arises from a nuclear incident or incidents at the SLAPS and/or Latty sites.

100.     The PAA does not provide any substantive elements for "public liability actions." The PAA only provides that a "public liability action shall be deemed to be an action arising under section 2210 of this title, and the substantive rules for decision in such action shall be derived from the law of the State in which the nuclear incident involved occurs, unless such law is inconsistent with the provisions of such section." 42 U.S.C. § 2014(hh).

101.     The PAA does not contain or reference any federal standards, regulations, or thresholds. See 42 U.S.C. § 2210.

102.     Under the umbrella of Plaintiff's "public liability action", Plaintiff asserts the following causes of action.

### COUNT I, SUBPART (A) – NEGLIGENCE

103.     Plaintiff realleges and incorporates by reference every allegation of this Complaint as if each were set forth fully herein.

104.     Radioactive isotopes are known human carcinogens and are among the most toxic materials known to man. When property becomes contaminated with these wastes, the dangers can persist in the environment for thousands of years. Radioactive wastes should be handled, stored, and disposed of with the utmost safety in mind. Exposures to radioactive wastes should be as low as is reasonably achievable.

105.     Knowing of the grave dangers posed by these radioactive wastes, the Defendants owed a duty of care to Ms. Pizzimenti and the public to ensure the safe and legal handling, storage, and disposal of the radioactive wastes in order to prevent significant bodily injury, sickness,

20

disease, and death.

106. Defendants also had a specific duty to warn or notify Ms. Pizzimenti of the potential hazards of exposure to radioactive, toxic and hazardous substances, and to warn or notify Ms. Pizzimenti of the fact that discharges or releases of these substances had occurred and were likely to occur in the future.

107. Further, Defendants had a duty to comply with applicable state, federal, and local governmental laws, regulations, and guidelines applicable to persons processing, handling, storing, and/or disposing of hazardous, toxic, and radioactive waste materials.

108. Defendants breached these duties by their reckless, negligent and grossly negligent processing, handling, storage, and/or disposal of hazardous, toxic, and radioactive waste materials as alleged herein. Such conduct was in utter non-compliance with applicable federal, state and local laws, regulations, and guidelines. Defendants' reckless, negligent, grossly negligent, and illegal conduct resulted in the dangerous release of hazardous, toxic, and radioactive substances into the communities around Coldwater Creek. These releases exposed Ms. Pizzimenti to radiation, causing or contributing to cause her EHE, resulting injuries, and death.

109. Defendants also failed to warn Ms. Pizzimenti of the actual and threatened releases of such hazardous, toxic, and radioactive substances and of the reasonably foreseeable effects of such releases, an omission that was reckless, negligent and grossly negligent.

110. Defendants failed to act to prevent their releases from harming Ms. Pizzimenti.

111. Defendants knew or should have known that their generation, management, storage, use, disposal, releases, or discharges of radioactive, toxic and hazardous substances as alleged herein would result in bodily injury, sickness, disease, and death to persons such as Ms. Pizzimenti who were exposed to radiation.

112.     Upon information and belief, Defendants' negligent training of personnel handling radioactive, toxic, and hazardous materials on site directly and proximately caused or contributed to cause Ms. Pizzimenti's injuries and death.

113.     Defendants' negligence throughout the history of the mishandling and improper dumping of hazardous, toxic, carcinogenic, radioactive wastes has resulted in repeated releases of radioactive materials and other hazardous materials onto surrounding property, including the properties where Ms. Pizzimenti lived, went to school, and frequented, in disregard of applicable regulations and Ms. Pizzimenti's rights.

114.     Defendants' negligence exposed Ms. Pizzimenti to excessive radiation and caused or contributed to cause her EHE, resulting injuries, and death.

115.     Ms. Pizzimenti's injuries and death resulted from wastes generated, disposed of, and controlled by Defendants.

116.     Ms. Pizzimenti did not consent to her injuries and did not contribute to cause her injuries or death.

### COUNT I, SUBPART (B) – NEGLIGENCE PER SE

117.     Plaintiff realleges and incorporates by reference every allegation of this Complaint as if each were set forth fully herein.

118.     Defendants violated Missouri regulations for Protection against Ionizing Radiation, 19 C.S.R. 20-10.070, 20-10.090, and the Missouri Clean Water Act, Mo. Rev. Stat. § 644.051.1, which require the safe storage and disposal of radioactive material so as to protect the health and safety of the public.

119.     Ms. Pizzimenti was a member of the class of persons that the Missouri regulations for Protection against Ionizing Radiation and Missouri Clean Water Act regulations were intended

to protect.

120.     Ms. Pizzimenti's exposure to radioactive contamination, resulting injuries, disease, and death are the kinds of harm that the Missouri regulations for Protection against Ionizing Radiation and Missouri Clean Water Act regulations were designed to prevent.

121.     Defendants' violations of Missouri regulations for Protection against Ionizing Radiation and Missouri Clean Water Act directly and proximately caused or contributed to cause Ms. Pizzimenti's injuries and death.

122.     To the extent applicable, Defendants violated the regulations in 10 C.F.R. Part 20, including but not limited to 10 C.F.R. 20.1, 10 C.F.R. 20.105, 10 C.F.R. 20.106, 10 C.F.R. 20.201, 10 C.F.R. 20.203, 10 C.F.R. 20.301, 10 C.F.R. 20.302, 10 C.F.R. 20.304, 10 C.F.R. 20.401, 10 C.F.R. 20.403, 10 C.F.R. 20.405.

123.     Ms. Pizzimenti was a member of the class of persons that 10 C.F.R. Part 20 was intended to protect.

124.     Ms. Pizzimenti's exposure to radiation, resulting injuries, disease, and death are the kinds of harm that 10 C.F.R. Part 20 was designed to prevent.

125.     To the extent applicable, Defendants' violations of 10 C.F.R. Part 20 directly and proximately caused or contributed to cause Ms. Pizzimenti's EHE, resulting injuries, and death.

126.     Defendants' negligence throughout the history of their mishandling and improper dumping of radioactive wastes in the St. Louis area has resulted in repeated releases of radioactive particles and other hazardous materials offsite in violation of applicable regulations and disregard for Ms. Pizzimenti's rights.

127.     Defendants' negligence exposed Ms. Pizzimenti to radiation in excess of background, causing or contributing to cause her EHE, resulting injuries, and death.

23

128.   Ms. Pizzimenti did not consent to her injuries and did not contribute to cause her injuries or death.

## COUNT I, SUBPART (C) – STRICT LIABILITY

129.   Plaintiff realleges and incorporates by reference every allegation of this Complaint as if each were set forth fully herein.

130.   Defendants engaged in the ultrahazardous activity of handling, storing, and/or disposing of radioactive waste.

131.   By handling, storing, and/or disposing of radioactive waste, Defendants created a high degree of risk of harm to Ms. Pizzimenti.

132.   Defendants have been unable or intentionally failed to eliminate the risk of harm caused by their handling, storing, and/or disposing of radioactive waste.

133.   The risk of harm created by Defendants' acts and omissions is significant.

134.   As a direct result of Defendants' abnormally dangerous activities that resulted in the emission of radioactive materials, Ms. Pizzimenti was exposed to excessive radiation causing or contributing to cause her EHE, resulting injuries, and death.

135.   Ms. Pizzimenti's injuries and death are of the kinds that result from the dangerous nature of handling, storing, and/or disposing of radioactive waste.

136.   Any value derived from Defendants' handling, storing, and/or disposing of radioactive waste is drastically outweighed by the injuries and death those activities caused or contributed to cause Ms. Pizzimenti and the resulting losses suffered by Plaintiff.

137.   Accordingly, Defendants are jointly and severally liable for any and all damages recoverable by Plaintiff as a result of Defendants' strict liability for handling, storing and/or disposing of radioactive materials, including, without limitation, any incidental or consequential

24

damages.

## COUNT I, SUBPART (D) – PUNITIVE DAMAGES

138. Plaintiff realleges and incorporates by reference every allegation of this Complaint as if each were set forth fully herein.

139. Defendants committed one or more of the willful, wanton, and malicious acts more fully set forth above which individually or cumulatively justify the award of punitive damages in this matter.

140. Defendants knew or had information from which, in the exercise of ordinary care, should have known that such conduct, as detailed above, created a high degree of probability of injury to Ms. Pizzimenti and others similarly situated.

141. The willful, wanton and malicious acts of Defendants, as detailed above, evidence Defendants' complete indifference to and/or conscious disregard for the safety of Ms. Pizzimenti, and others similarly situated.

142. The PAA does not prohibit punitive damages for conduct occurring before 1988 when 42 U.S.C. § 2210(s) took effect.

143. The PAA does not prohibit punitive damages for persons who the United States is not obligated to make payments under an agreement of indemnification. See 42 U.S.C. § 2210(s).

144. Mallinckrodt's PAA indemnification agreement is limited to liability that arises out of or in connection with its contractual activity. The St. Louis Airport Authority, Cotter, ComEd nor Jarboe never conducted any activities connected or related to Mallinckrodt's contractual activity and their liability is not connected or related to Mallinckrodt's contractual activity.

## COUNT I, SUBPART (E) – CIVIL CONSPIRACY

145. Plaintiff realleges and incorporates by reference every allegation of this Complaint

as if each were set forth fully herein.

146.    Defendants wrongfully and fraudulently agreed and conspired together to injure Ms. Pizzimenti by wrongfully releasing radioactive wastes, as more fully alleged herein.

147.    Defendants wrongfully and fraudulently agreed and conspired together to take the actions alleged herein giving rise to causes of action for negligence, negligence per se, strict/absolute liability, and punitive damages as alleged herein.

148.    As a result of the conspiracy of the Defendants, Ms. Pizzimenti suffered injuries and death, and Plaintiff suffered damages recoverable under Missouri's wrongful death law, as more fully alleged herein.

## COUNT I, SUBPART (F) – WRONGFUL DEATH

149.    Plaintiff realleges and incorporates by reference every allegation of this Complaint as if each were set forth fully herein.

150.    Plaintiff J.W. is the surviving minor child of Ms. Pizzimenti and is authorized to bring this action under Mo. Rev. Stat. § 537.080.

151.    Defendants' acts and omissions caused or contributed to cause Ms. Pizzimenti's EHE, resulting injuries, and death.

152.    As a direct result of Ms. Pizzimenti's wrongful death, Plaintiff has sustained damages recoverable under Mo. Rev. Stat. § 537.090, including pecuniary losses; funeral expenses, the reasonable value of services, consortium, companionship, comfort, instruction, guidance, counsel, training, and support of which J.W. has been deprived; and the aggravating circumstances attendant to the injury and death.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff J.W., a minor, by and through his Next Friend, Ryan Westholt,

26

demands judgment in his favor and against Defendants, jointly and severally, for general damages, special damages, punitive and exemplary damages, prejudgment interest, costs of the action, and such further relief as this Court deems proper.

Dated:  August 11, 2026

Respectfully submitted,

KEANE LAW LLC

*/s/ Ryan A. Keane*
Ryan A. Keane, #62112
7711 Bonhomme Ave., Ste. 600
St. Louis, MO 63105
Phone: (314) 391-4700
Fax: (314) 244-3778
ryan@keanelawllc.com

JOHNSON GRAY, LLC
Anthony D. Gray, #51534
2705 Dougherty Ferry Rd., Suite 100
St. Louis, MO 63122
Phone: (314) 385-9500
agray@johnsongraylaw.com

COOPER LAW FIRM, L.L.C.
Victor Cobb (LA #36830) *PHV forthcoming*
Matthew Camm (LA #35692) *PHV forthcoming*
824 Elmwood Park Blvd., Suite 130
Harahan, LA 70123
Phone: (504) 399-0009
vcobb@clfnola.com
mcamm@clfnola.com

and

THOMPSON BARNEY
Kevin W. Thompson (WV #5062) *PHV forthcoming*
David R. Barney, Jr. (WV #7958) *PHV forthcoming*
2030 Kanawha Boulevard, East
Charleston, WV  25311
Telephone:  304-343-4401
Facsimile:  304-343-4405
Email:  kwthompson@gmail.com

*Attorneys for Plaintiff*

27